J-S27018-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DONNA H. ARTHUR | : | |
| | : | |
| Appellant | : | No. 752 MDA 2022 |

Appeal from the Judgment of Sentence Entered April 1, 2022
In the Court of Common Pleas of Centre County Criminal Division at
No(s): CP-14-SA-0000039-2021

BEFORE: BENDER, P.J.E., BOWES, J., and SULLIVAN, J.

MEMORANDUM BY BOWES, J.:          **FILED: AUGUST 29, 2023**

Donna H. Arthur appeals from the judgment of sentence of a fine and non-reporting probation imposed after she was convicted of animal neglect. We vacate Appellant's sentence and conviction and remand for further proceedings consistent with this memorandum.

The trial court offered the following summary of the case history upon Appellant's appeal from an adverse decision by the magisterial district court:

> This matter arises out of a citation for animal neglect that occurred on April 6, 2021, wherein [Appellant] was found to be keeping several cats and/or newborn kittens in a locked and filthy vehicle, with the windows rolled up, on an unseasonably warm spring day, and with an internal vehicle temperature of one-hundred twenty degrees Fahrenheit.
>
> . . . .
>
> On March 15, 2022, the first day of [Appellant]'s *de novo* trial, [Appellant] for the first time made an oral representation to th[e trial c]ourt that she wished for court appointed counsel, and

that she had purportedly emailed the undersigned judge's chambers to notify them of such request. Th[e trial c]ourt denied [Appellant]'s request, erroneously and unintentionally misrepresenting to [Appellant] that it could not appoint counsel for a summary appeal, and then proceeded to conduct the *de novo* trial.

The Commonwealth's first witness, Lisa King ("Ms. King"), is the founder and president of Hope's Dream Rescue and Sanctuary, a local nonprofit that provides assistance and free veterinary care to stray cats and to owners who lack the financial means to provide for their cats themselves. Ms. King testified that her organization had received a report of the cats in question being kept in a hot car and that, at the time of the incident, the external temperature was roughly seventy-six degrees Fahrenheit, while the internal temperature of the vehicle was measured at one-hundred twenty degrees Fahrenheit. Ms. King also testified that the vehicle was parked with the windows rolled up on an asphalt parking lot outside the establishment where [Appellant] worked, and that the conditions inside the vehicle were filthy. Ms. King further testified that four five-day old kittens were ultimately recovered from the vehicle, and that such young kittens cannot eat kibble and need to be either bottle-fed or nursed every two hours. Finally, Ms. King testified that one kitten of the litter had already died under [Appellant]'s watch, and that the mother of the kittens had previously escaped.

During Ms. King's testimony, the Commonwealth also produced photographic evidence of the state of [Appellant]'s vehicle, and of the temperature recorded at the time of the incident. . . .

The court next heard testimony from humane society police officer Harold Walstrom ("Officer Walstrom"). Officer Walstrom testified that [Appellant]'s vehicle was "packed full of stuff," that the temperature inside the vehicle had been measured with a laser thermometer, and that the thermometer indicated an internal temperature of roughly one-hundred twenty degrees Fahrenheit. There was some discrepancy in the testimonies regarding the number of cats in [Appellant]'s vehicle at the time of the citation, with Officer Walstrom testifying that there were a total of six cats inside the vehicle . . . . Officer Walstrom also testified that, after waiting for thirty minutes to see if [Appellant] would return, he placed a call for assistance and had a police officer escort

[Appellant] from her place of work back to her vehicle. The officer also credibly testified on rebuttal that, after opening the door of [Appellant]'s vehicle, he was able to feel a wave of heat release from said vehicle.

. . . .

The Commonwealth's final witness was Cindy Viehdorfer ("Ms. Viehdorfer"), an associate of local nonprofit Happy Valley Animals in Need. Ms. Viehdorfer explained what the limits of her organization were, that they do not offer boarding services and can only provide care when cats are surrendered to them. Ms. Viehdorfer also testified that [Appellant] had refused to surrender her cats after being referred to her. Ms. Viehdorfer also testified that, after beginning to care for the newborn kittens that Happy Valley Animals in Need had received, the smallest of them was unable to be saved and ultimately passed away, likely from heat exhaustion. Ms. Viehdorfer also testified as to the costs associated with caring for the kittens, estimating the cost to be "around $1,200, $1,500 just for basic KMR, bottles, food, anything else that they would need at that time." Ms. Viehdorfer credibly explained that caring for newborn kittens is particularly challenging:

> I mean, like bottle babies, we'll start with they need fed every two hours. They have to be maintained at a certain heat. They have to be expressed. Normally, a mom kitten [*sic*] does all that, like licks them and makes them go to the bathroom and makes them urinate after they eat. That's the mom. But at this point, you're the mom. So you've got to — like having a baby, you've got to be up every two hours. You've got to make sure all this is done. Plus, you have to keep them clean. Because if they go and they're all — it's a fulltime job for about three-and-a-half weeks, four weeks after a kitten is born.

Finally, Ms. Viehdorfer testified that living conditions for kittens need to be between seventy-five and eighty degrees Fahrenheit, that too high of heat can kill kittens, and that kittens would not survive long durations of time in one-hundred twenty degrees Fahrenheit.

[Appellant] herself testified . . . [and] conceded to living in her car with the cats, and stated that she was spending over $400.00 a month on her cats . . . . [Appellant] further testified that her car was not hot, that she was being stalked, and that Officer Walstrom was uncivil and shouted at her, threatening to take her cats and ruin her reputation. However, in light of other credible evidence and testimony to the contrary, the court found [Appellant] to be not credible. . . .

After closing arguments, th[e c]ourt ultimately found that the Commonwealth had met its burden of proving [Appellant] neglected her animals beyond a reasonable doubt, albeit just barely. . . . [T]he Court found Officer Walstrom to be credible as to his recounting of events, and concluded from his testimony regarding the sunny weather, the sealed car, the car being parked on an asphalt parking lot, and the wave of heat released from the car that the Commonwealth met its burden in proving [Appellant] failed to provide adequate shelter to protect her animals from the weather.

Consequently, the court entered its verdict and sentenced [Appellant] to pay a fine of $100, and placed her on unsupervised probation, costs waived, for ninety days, during which time [Appellant] was prohibited only from possessing animals at any point in which she was forced to reside in her motor vehicle.

Trial Court Opinion, 11/23/22, at 2-10 (cleaned up).

Appellant filed a timely *pro se* notice of appeal to this Court. When Appellant asked for an extension of time to file her docketing statement, this Court noted her lack of counsel despite the fact that she had faced a potential sentence of imprisonment, and remanded to the trial court to determine her eligibility for the appointment of counsel. ***See*** Order 7/7/22. The trial court responded with an order indicating that, based upon Appellant's admission that she earned $21 per hour, she was not eligible for court-appointed counsel. ***See*** Order, 7/27/22. When Appellant sought a second extension,

this Court remanded for the trial court to "re-evaluate Appellant's request for the appointment of counsel in light of her current circumstances." Order, 10/17/22 (citing *Commonwealth v. Carlson*, 244 A.3d 18, 25 (Pa.Super. 2020)[1]). Shortly thereafter, the Center County Public Defender entered an appearance on Appellant's behalf and filed a verified statement of Appellant's indigent status, a Pa.R.A.P. 1925(b) statement, and ultimately a brief posing the following questions, which we have re-ordered for ease of disposition:

I. Did the lower court abuse its discretion in concluding, without inquiry into [Appellant's] financial circumstances, that it could not appoint counsel because the trial was for a summary offense?

II. Did the Commonwealth fail to prove that [Appellant]'s automobile provided insufficient shelter from the weather for her [five] kittens to support the guilty verdict to the criminal offense of animal neglect?

III. Did the lower court abuse its discretion in denying [A]ppellant the opportunity to impeach a witness with his

---

[1] In that case we observed:

> To the extent the trial court assessed Appellant's right to appointed counsel based principally upon the singular representation that Appellant was earning a living wage, the trial court erred. The test under Rule 122(A)(2) is not whether a defendant earns a living wage, but rather, whether he or she is without financial resources or is otherwise unable to employ counsel. While certainly consideration of a person's income is a weighty factor, the test under Rule 122(A)(2) is more encompassing than the single criteria of a person's wages. Instantly, the trial court failed to conduct any hearings for purposes of creating a record on Appellant's eligibility for appointed counsel under the criteria of Rule 122(A)(2).

*Commonwealth v. Carlson*, 244 A.3d 18, 25 (Pa.Super. 2020).

prior recorded testimony on the basis that the instant proceeding was a trial *de novo* and what happened at the prior proceeding had no relevance?

Appellant's brief at 6.[2]

We begin with Appellant's contention that the trial court abused its discretion in declining to appoint counsel for her in accordance with Pa.R.Crim.P. 122 and 454. The latter Rule provides as follows in relevant part:

(A) Immediately prior to trial in a summary case:

(1) the defendant shall be advised of the charges in the citation or complaint;

(2) if, in the event of a conviction, there is a reasonable likelihood of a sentence of imprisonment or probation, the defendant shall be advised of the right to counsel and

(a) upon request, the defendant shall be given a reasonable opportunity to secure counsel, or

(b) if the defendant is without financial resources or is otherwise unable to employ counsel, counsel shall be assigned as provided in Rule 122; and

(3) the defendant shall enter a plea.

Pa.R.Crim.P. 454. Rule 122 in turn states as follows in pertinent part:

Counsel shall be appointed:

(1) in all summary cases, for all defendants who are without financial resources or who are otherwise unable to employ counsel when there is a likelihood that imprisonment will be imposed;

---

[2] The Commonwealth advised this Court that it would not file a brief but rested upon the analysis of the trial court's opinion.

(2) in all court cases, prior to the preliminary hearing to all defendants who are without financial resources or who are otherwise unable to employ counsel;

(3) in all cases, by the court, on its own motion, when the interests of justice require it.

Pa.R.Crim.P. 122(A).

Where a court determines before trial that it is unlikely that a term of supervision would result and no such term is imposed, the court has no obligation to appoint counsel or advise the defendant of the right to counsel. *See Commonwealth v. Blackham*, 909 A.2d 315, 318 (Pa.Super. 2006). However, "[n]o defendant may be sentenced to imprisonment or probation if the right to counsel was not afforded at trial." Pa.R.Crim.P. 122, *Comment* (citing, *inter alia*, **Alabama v. Shelton**, 535 U.S. 654 (2002)); Pa.R.Crim.P. 454, *Comment* (same). *See also Commonwealth v. Soder*, 905 A.2d 502, 504 (Pa.Super. 2006) (vacating and remanding for a new trial, "prior to which appropriate action under Rule 454(A) may be undertaken," because the defendant received a sentence of imprisonment following a trial that took place without the court first complying with Rule 454(A)).

Here, after obtaining several continuances to attempt to secure private representation, Appellant requested the appointment of counsel. The trial court denied the request without inquiring into Appellant's ability to afford counsel based upon what it has since candidly acknowledged was a misinterpretation of Rule 122. *See* Trial Court Opinion, 11/23/22, at 15-16.

Therefore, Appellant's sentence and conviction cannot stand.  ***See Soder***, ***supra***.

Rather than ceasing our review there and remanding for a new trial following the trial court's full compliance with Rule 454A, we consider Appellant's challenge to the sufficiency of the evidence to sustain her conviction because if it is meritorious, it would entitle her to the more favorable result of complete discharge.  ***See***, ***e.g.***,  ***Commonwealth v. Koch***, 39 A.3d 996, 1001 (Pa. Super. 2011).

The following standard of applies to appellate review of a sufficiency claim:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt.  In applying the above test, we may not weigh the evidence and substitute our judgment for a fact-finder.  In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence.  Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.  The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.  Moreover, in applying the above test, the entire record must be evaluated and all evidence received must be considered.  Finally, the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Haahs***, 289 A.3d 100, 104 n.2 (Pa.Super. 2022) (cleaned up).

The offense of neglect of animal is defined as follows, in relevant part:

A person commits an offense if the person fails to provide for the basic needs of each animal to which the person has a duty of care, whether belonging to himself or otherwise, including any of the following:

. . . .

(2) Access to clean and sanitary shelter and protection from the weather. The shelter must be sufficient to permit the animal to retain body heat and keep the animal dry.

18 Pa.C.S. § 5532(a).

Appellant's attack on the evidentiary sufficiency of her conviction is two-fold. First, she asserts that the subsection of the statute under which she was convicted only "directs the pet owner to make available a shelter that keeps the pet dry and warm when the weather is damp and cold." Appellant's brief at 19. She argues that the concern "that pets should not be locked into unventilated vehicles in the baking sun for extended periods of time" is "a condition not contemplated in this legislation." *Id*.

We disagree with Appellant's statutory interpretation. We observe that "the object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the legislature. When the words of a statute are clear and free from all ambiguity, they are presumed to be the best indication of legislative intent." *Commonwealth v. McCabe*, 265 A.3d 1279, 1287 (Pa. 2021) (citation omitted). In this vein, words are to be given "their common and approved usage." 1 Pa.C.S. § 1903(a).

The plain language of subsection two of the animal neglect statute requires those with a duty to care for animals to assure access to two things: (1) "clean and sanitary shelter" **and** (2) "protection from the weather." 18 Pa.C.S. § 5532(a)(2). In further describing the necessary shelter to which the animal must have access, the legislature specified that it "must be sufficient to permit the animal to retain body heat and keep the animal dry." **Id**. However, there is no indication that the access to "protection from the weather" concerns only cold and damp conditions. Rather, the plain and ordinary meaning of the word weather encompasses a broader array of circumstances, including excess heat. **See** https://www.merriam-webster.com/dictionary/weather (last visited July 24, 2023) (defining "weather" principally as "the state of the atmosphere with respect to **heat or cold**, **wetness or dryness**, calm or storm, clearness or cloudiness" (emphasis added). **See also** https://www.dictionary.com/browse/weather (last visited July 24, 2023) ("[T]he state of the atmosphere with respect to wind, temperature, cloudiness, moisture, pressure, etc.").

Hence, we ascertain the meaning of the phrase "access to . . . protection from the weather" to indicate that the animals in question must be able to go to a place that protects them from heat, as well as cold, that threatens their basic needs. **Accord Commonwealth v. Tomey**, 884 A.2d 291, 295 (Pa.Super. 2005) (affirming conviction based upon deprivation of access to

clean and sanitary shelter where the animals lacked "access to sufficient food, water or **ventilation**" (emphasis added)).

In her second sufficiency argument, Appellant contends that the Commonwealth did not establish that her car did not provide the kittens access to protection from the weather. Specifically, she argues as follows:

> The weather at 1 pm on April 6th was sunny with a temperature of 76 degrees. The dashboard of Ms. Arthur's car minutes after she was seen standing there with the door open changing her shirt for work was 120 degrees. An hour later, with the doors shut and the windows rolled up the temperature on the dashboard is still 120 degrees. Knowing the first reading, animal control was content to wait a full hour with those windows rolled up to even check on the kittens. And when they finally did, they were fine. It defies logic and common sense to speculate that the temperature on the floor under the dashboard would have been the same or higher.

Appellant's brief at 20.

Appellant's argument essentially asks this Court to make the opposite credibility determinations from those of the fact-finder. Specifically, Appellant would have us reject Officer Walstrom's testimony that he felt a wave of heat when he opened the door, and Ms. Viehdorfer's testimony that one of the kittens died from heat exhaustion, in favor of Appellant's testimony about the floor of the car not being hot when it read 120 degrees on the dashboard. As this flies in the face of our standard of review, we reject Appellant's second sufficiency argument. *See Haahs*, *supra* at 104 n.2.

Having determined that Appellant is not entitled to discharge, we order the remedy applicable for the trial court's error in failing to assess Appellant's right to counsel. Specifically, pursuant to *Soder*, *supra*, we vacate

Appellant's sentence and conviction and remand for a new trial following full compliance with Rule 454.[3]

Judgment of sentence vacated. Conviction vacated. Case remanded for further proceedings consistent with this memorandum. Jurisdiction relinquished.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/29/2023

---

[3] Given our disposition, we need not consider Appellant's evidentiary issue concerning the trial court's disallowance of impeachment evidence that was not prepared for use at trial, but which Appellant asked to email to the court and prosecution in the midst of the proceedings. *See* Trial Court Opinion, 11/23/22, at 14.